IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____

ALBUQUERQUE AMBULATORY EYE
SURGERY CENTER LLC,

       Plaintiff,

vs.                                      1:21-cv-00280-KWR-JFR

TRANSPORTATION INSURANCE COMPANY,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court upon Defendant's Motion to Dismiss for Failure to State a Claim. **Doc. 16**. Having reviewed the parties' pleadings and the relevant law, the Court concludes that oral argument is not necessary. The Court finds that the motion is well taken, and is therefore **GRANTED IN PART AND DENIED IN PART** for the reasons provided below. Counts I, III, IV, and V are dismissed without prejudice and with leave to amend, but Count II remains.

## BACKGROUND

This case arises out of a dispute over insurance coverage concerning business losses suffered as a result of the coronavirus (COVID-19) pandemic. The Complaint contains the following allegations. Plaintiff Albuquerque Ambulatory Eye Surgery Center LLC ("AAESC") is an eye surgery center in Albuquerque, New Mexico. *See* **Doc. 1-1, ¶ 1**. Defendant Transportation Insurance Company ("Transportation") is an Illinois insurance company that issued an insurance

policy to Plaintiff, CNA Connect Policy No. B 2067314575 ("the Policy").  *Id.* ¶¶ **1, 9, 20**; **Doc. 1-1, Ex. 1, at 29**; *see also* **Doc. 16, at 1-2**.

Plaintiff alleges that its business was impacted by the coronavirus pandemic and the resulting government health orders and seeks coverage from Defendant over the loss of the use of its premises, lost business income, extra expenses, and other business-related losses stemming from business disruptions caused by the coronavirus. *See* **Doc. 1-1, ¶ 1**.  On March 11, 2020, the first confirmed case of COVID-19 was reported in New Mexico. *Id.* **¶ 55**.  The same day, New Mexico Governor Michelle Lujan Grisham issued an executive order in response to the increasing infection rates in the state and declared a public health emergency. *Id*. **¶ 56**; **Doc. 1-1, Ex. 3, at 191**.  In the following months, New Mexico Department of Health Secretary Kathyleen Kunkel issued additional public health orders, including orders limiting the size of gatherings to no more than 100 people, advising citizens to stay home, and warning citizens to undertake only outings "absolutely necessary for their health, safety, or welfare." *Id*. **¶¶ 58-60** (emphasis omitted). Additionally, on March 16, 2020, the American Academy of Ophthalmology issued an advisory that "all ophthalmologists cease providing any treatment other than urgent or emergent care immediately." *Id.* **¶ 61**.

Then, on March 23, 2020, a public health order required all non-essential businesses to reduce their in-person workforce by 100%. *Id.* **¶ 63**.  Essential businesses were authorized to remain open, minimize their operations and staff "to the greatest extent possible," and maintain social distancing and safety protocols. *Id.*; *see also* **Doc. 1-1, Ex. 5, at 200**.  Plaintiff, a medical eye surgery center, was considered an essential business. *See* **Doc. 1-1, ¶ 66**.  However, on March 24, 2020, a public health order imposed temporary restrictions on "non-essential health care services, procedures, and surgeries." *Id.* **¶ 65**.  As a result, Plaintiff alleges it was prohibited from

performing non-essential procedures, such as surgeries that could be delayed for three months without undue risk to a patient's health.  *Id.* ¶ **66**.  Thus, Plaintiff was limited to performing only "emergency" medical care and surgical procedures.  *Id.*

Plaintiff alleged it closed its business on March 16, 2020, "except to provide limited urgent and emergency services."  *Id.* ¶ **73**.  Plaintiff did not reopen until April 17, 2020.  *Id.*  Plaintiff alleges that by April and May 2020, its business appointments were down 96% and 60%, respectively, when compared to pre-pandemic levels.  *Id.* ¶ **76**.  Plaintiff asserts its business continues to operate with reduced capacity.  *Id.* ¶ **77**.  Further, Plaintiff alleges that three of its employees have tested positive for COVID-19 and that six patients that visited its facilities later tested positive for COVID-19.  *Id.* ¶ **79**.

On May 8, 2020, Plaintiff filed a claim seeking coverage under the Policy.  *Id.* ¶ **92**.  The Policy was effective from June 1, 2019 to June 1, 2020 and Plaintiff alleges that it was an "all-risk commercial property policy."  *Id.* ¶ **20**.  Plaintiff asserts that the Policy provides certain coverage, including coverage for "Business Income Loss and Extra Expenses, Civil Authority orders, and Business Income Loss from Dependent Property."  *Id.* ¶ **28**.  Plaintiff alleges that under the Policy, Defendant "committed to pay for direct physical loss of or damage to Covered Property at the premises caused by or resulting from any Covered Cause of Loss."  *Id.* ¶ **23** (internal quotations and alterations omitted).  Plaintiff states that the coronavirus "harmed and continues to harm AAESC, causing physical loss and loss of intended use and physical damage to the premises, including its air."  *Id.* ¶ **83**.  Therefore, Plaintiff asserts it was entitled to coverage.

Plaintiff alleges that on May 22, 2020, "without reviewing any facts around the claim or seeking additional information," Defendant denied coverage under the Policy.  *Id.* ¶ **95**.  On July 10, 2020, Plaintiff claims it sought reconsideration from Defendant regarding coverage and

provided estimates of its losses and copies of the relevant public health orders. *Id.* ¶ **96**. However, Plaintiff alleges that Defendant failed to adequately investigate its claim, and on October 7, 2020, confirmed denial of coverage under the Policy. *Id.* ¶ **98**. Plaintiff contends that the denial of coverage was improper in light of the relevant Policy provisions. *Id.* ¶¶ **29-41**. According to Plaintiff, the Policy has no "applicable exclusions" that would preclude coverage nor does it have a "virus exclusion." *Id.* ¶ **26**. Therefore, Plaintiff asserts that losses due to COVID-19 are covered losses under the Policy to which Defendant is responsible.

The insurance policy at issue contains the following relevant provisions. First, the Policy provides that Defendant "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause Of Loss." *See* **Doc. 1-1, Ex. 1, at 45**. Next, the Policy contains a "Business Income and Extra Expense" Endorsement which provides the following:

**1.     Business Income**

b. We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

*Id.* **at 67**.

**2.     Extra Expense**

a. Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

b. We will pay Extra Expense (other than the expense to repair or replace property) to:

(1) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to

equip and operate the replacement premises or temporary locations; or

(2) Minimize the "suspension" of business if you cannot continue "operations."

*Id*. at 68.  The Policy also contains a "Civil Authority" Endorsement which states:

**Civil Authority**

1.  When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises.

[]The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

*Id.* **at 93**.  Finally, the Policy contains a "Dependent Property" Endorsement which states:

**Business Income and Extra Expense – Dependent Property**

1.  When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur due to the "suspension" of your "operations" during the "period of restoration."

[]The "suspension" must be caused by direct physical loss or damage at the premises of a Dependent Property, caused by or resulting from a Covered Cause of Loss.

*Id.* **at 184**.

The Policy provides definitions of some terms referenced in these provisions.  Under the Policy, a "Dependent Property" means property operated by third parties upon whom the insured depends on to:

a. Deliver materials or services… (Contributing Locations);

b. Accept [its] products or services (Recipient Locations);

c. Manufacture products for delivery to [its] customers under contract of sale (Manufacturing Locations); or

d. Attract customers to [its] business (Leader Locations).

5

*Id.*   Further, "suspension" means the "partial or complete cessation of [the insured's] business activities," *id.* **at 64**, and "operations" means "the type of your business activities occurring at the described premises and tenantability of the described premises."  *Id.* **at 62**.

Additionally, the "period of restoration" begins with "the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises" and ends on the date when "the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality," or "when business is resumed at a new permanent location," whichever is earlier.  *Id.* **at 62**.  Under the Policy, "Covered Causes of Loss" are any "risks of direct physical loss" unless excluded by the Policy.  *Id.* **at 46** (capitalization omitted).  However, the Policy does not include a definition for the words "loss," "physical loss," or "damage," nor does it include a definition of the phrase "direct physical loss."[1]

After Defendant affirmed its denial of Plaintiff's insurance claim under the Policy, Plaintiff filed suit in the Second Judicial District Court, Bernalillo County, State of New Mexico alleging the following:

Count I:       Breach of Contract

Count II:      Breach of Duty of Good Faith and Fair Dealing

Count III:     Violation of the New Mexico Insurance Practices Act, NMSA § 59A-16-20

Count IV:      Violation of the New Mexico Unfair Practices Act, NMSA § 57-12-2(D)

Count V:       Declaratory Judgement under NMSA §§ 44-6-1, 44-6-2, and 44-6-4.

Defendant removed this case to this Court (**Doc. 1**) and subsequently filed a motion to dismiss this case for failure to state a claim upon which relief can be granted.  **Doc. 16**.

---

[1] The Policy also includes a number of exclusions that are not relevant to the instant motion.

**LEGAL STANDARD**

Rule 12(b)(6) permits the Court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must have sufficient factual matter that if true, states a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). As such, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). All well-pleaded factual allegations are "viewed in the light most favorable to the nonmoving party." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014). In ruling on a motion to dismiss, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The Court must draw all reasonable inferences in Plaintiff's favor. *Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007). However, mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555.

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere possibility that the defendant acted unlawfully. *Id.*; *see also Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) ("[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."). "This requirement of

plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008). The degree of specificity required in the complaint "depends on context," *id.*, and "[d]etermining whether a complaint states a plausible claim for relief will...be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Additionally, in ruling on a motion to dismiss, the Court may consider documents and materials "referenced in the Complaint and central to Plaintiff's claim." *See NCMIC Ins. Co. v. Brown*, No. 17 CV 1000 JAP/CG, 2018 WL 1508550, at *2 (D.N.M. Mar. 26, 2018); *see also Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008). The insurance policy and the New Mexico health orders attached to the Complaint are such documents and Defendant does not dispute the authenticity of these documents. Accordingly, the Court will consider them without converting the instant motion into a Rule 56 motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

## DISCUSSION

Defendant argues that Plaintiff's Complaint must be dismissed because Plaintiff fails to state a claim upon which relief can be granted. Based on a plain language review of the Policy, the parties' briefs, and the applicable caselaw, the Court finds that Plaintiff has failed to plausibly plead a claim for relief under Counts I, III, IV, and V, and dismisses those counts without prejudice. However, Plaintiff has sufficiently stated a claim for relief under Count II.

**I.     Plaintiff Has Failed to Plausibly State a Breach of Contract Claim (Count I).**

"In cases arising under diversity jurisdiction, the federal court's task...simply to 'ascertain and apply the state law.'" *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). The Court must

follow the most recent decisions from the state's highest court, but where no controlling state decision exists, the Court "must attempt to predict what the state's highest court would do." *Id.* In doing so, the Court may "seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Id.* at 665–66 (internal quotations and citations omitted).

Defendant removed this case to federal Court on the basis of the Court's diversity jurisdiction.  The parties agree that New Mexico law governs the Policy.  *See* **Doc. 1-1, ¶ 12**; **Doc. 16, at 9**.  Under New Mexico law, insurance policies are treated "as an ordinary contract to be construed according to customary principles of contract interpretation." *Carolina Cas. Ins. Co. v. Nanodetex Corp.*, 733 F.3d 1018, 1022 (10th Cir. 2013).  A policy "must be construed as intended to be a complete and harmonious instrument designed to accomplish a reasonable end." *Safeco Ins. Co. of Am., Inc. v. McKenna*, 565 P.2d 1033, 1037 (N.M. 1977).

Where policy terms "have a common and ordinary meaning, that meaning controls in determining the intent of the parties." *United Nuclear Corp. v. Allstate Ins. Co.*, 285 P.3d 644, 647 (N.M. 2012).  If a provision appears "questionable or ambiguous," the Court must first look to "whether their meaning and intent is explained by other parts of the policy." *Rummel v. Lexington Ins. Co.*, 945 P.2d 970, 976 (N.M. 1997).  The "traditional rules of punctuation, syntax, and grammar may also help clarify a contractual ambiguity." *Id.*  However, a provision or policy term is ambiguous only if it is "**reasonably and fairly susceptible of different constructions**." *See Knowles v. United Servs. Auto. Ass'n*, 832 P.2d 394, 396 (N.M. 1992) (emphasis added) (internal quotations omitted).

9

Generally, "an insurance policy which may reasonably be construed in more than one way should be construed liberally in favor of the insured." *Battishill v. Farmers All. Ins. Co.*, 127 P.3d 1111, 1115 (N.M. 2006). Yet, the Court will not "strain[] construction" of terms, and an "ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." *Id.* In construing an insurance policy, initially, the insured party "bears the burden to show that coverage is established under a provision of coverage." *Evanston Ins. Co. v. Desert State Life Mgmt.*, 434 F. Supp. 3d 1051, 1090 (D.N.M. 2020). Then, once coverage is established, the insurer "bears the burden of proving the policy excludes coverage." *Id.*

Here, this case presents a single issue: was the closure of Plaintiff's business due to the COVID-19 pandemic caused by direct physical loss of or damage to the insured property? If Plaintiff has suffered such a loss, the Policy provides for reimbursement of lost business income. An interruption of Plaintiff's business by events not reasonably described or pled as direct physical loss would not qualify for coverage.

**A. Plaintiff Has Failed to Sufficiently Allege Coverage under the Policy.**

The Policy provides that Defendant "will pay for **direct physical loss of or damage to** Covered Property at the premises…caused by or resulting from a Covered Cause Of Loss." *See* **Doc. 1-1, Ex. 1, at 45** (emphasis added). Qualifying losses then allow Plaintiff to recover under applicable provisions of the Policy. Accordingly, the Court must determine whether Plaintiff's allegations, based on COVID-19 and the related closure orders, constitute "physical loss or damage" under the Policy.

Here, Defendant moves to dismiss Plaintiff's Complaint, arguing that the "the plain, ordinary meaning of the word 'physical' is that the loss or damage at issue must be 'tangible' or

'material,'" and therefore, losses stemming from the coronavirus pandemic and resulting government orders cannot be covered under the Policy. *See* **Doc. 16, at 10**. In response, Plaintiff argues that the Policy is ambiguous. Plaintiff asserts that loss is defined as "the act of losing possession," thus, the "loss of use" of its premises due to the coronavirus is sufficient to trigger coverage and there is no requirement for "physical alteration" under the Policy. **Doc. 25, at 8, 10, 15**. The parties point to state and federal court decisions across the country that they allege support their reading of the definition of "direct physical loss" and why the presence of the coronavirus is or is not a "direct physical loss" covered under the Policy.

Additionally, Defendant argues that Plaintiff cannot plausibly state a breach of contract claim because: (1) Plaintiff does not allege facts to support the Policy's Business Income and Extra Expense Endorsement; (2) Plaintiff does not allege a period of restoration; (3) Plaintiff does not allege facts to support a valid Civil Authority claim; and (4) Plaintiff does not allege facts to support a valid Dependent Property Claim. **Doc. 16, at 10–21**. Plaintiff counters that: (1) there is no policy requirement for "tangible" or "physical alteration" in order to show "direct physical loss"; (2) if damaged airspace can trigger coverage, then it follows that the Policy must be read such that airspace can be "repaired" and "made ready for operations"; (3) Plaintiff has sufficiently pled that the government orders are covered perils that resulted in physical loss and triggered Civil Authority coverage; and (4) because Defendant failed to include a virus or pandemic exclusion, the absence of such an exclusion demonstrates Defendant's intent to cover such losses. *See* **Doc. 25, at 15–23**.

As noted, the Policy does not define "direct physical loss," and to date, the Court is not aware of any New Mexico state court that has opined on the meaning of this precise phrase in a reported opinion. However, there is sufficient guidance from other courts applying the same

11

principles of contract law to almost identical insurance policy provisions to guide the Court's analysis.  After reviewing the Complaint, the motion, and the response, "[o]n the assumption that all of the allegations in the complaint are true (even if doubtful in fact)," the Court concludes that Plaintiff has not advanced sufficient factual allegations "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

### 1.  The Plain Meaning of "Loss" and "Direct Physical Loss."

Plaintiff argues that "physical loss" must mean "something different" than the word "damage."  *See* **Doc. 25, at 8**.  Here, Plaintiff asserts that "physical" means "as relating to material things that are "perceptible especially through the senses," and loss is defined as "the act of losing possession."  *Id.* (internal quotations omitted) (quoting Merriam-Webster Dictionary (Online ed. 2020)).  Plaintiff alleges that the "dangerous conditions of the Coronavirus and the government orders were the direct cause" of its loss because Plaintiff "lost the full and intended use of its medical facility – a physical loss of its premises."  *Id.* **at 7**.  According to Plaintiff, "[t]his impairment alone is sufficient to trigger coverage, but [Plaintiff] also suffered physical loss because of the Coronavirus's presence onsite, infiltrating the premises' air – thereby physically altering the condition of the premises' airspace – attaching to the surfaces, and ultimately rendering the premises unfit for normal use."  *Id.*  Defendant does not appear to contest Plaintiff's definition of the word "loss," rather, Defendant asserts that "physical" modifies the word "loss," and to "read the Policy as extending coverage to non-physical losses would render the phrase 'direct physical' meaningless, violating New Mexico principles of contract interpretation."  *See* **Doc. 26, at 3–5**; **Doc. 16, at 10–12**.

The Court agrees that Plaintiff provides reasonable and common definitions of the terms. However, the Court is unpersuaded that using these definitions, "loss" means "loss of use" or "loss

of the essential function" sufficient to trigger coverage under a plain reading of the Policy.  *Id.* **at 10–11**.  As a threshold issue, the Court disagrees that the phrase "physical loss or damage to property" is ambiguous.  *Cf. United Nuclear Corp.*, 285 P.3d at 651 (finding ambiguity in the word "sudden" where half of the dictionaries accorded a temporal meaning to the word and the other half defined the term as "unexpected").  The word "loss" is a word susceptible to many meanings depending on context, but in this case, the parties do not provide two conflicting definitions of the term.  Rather, the meaning of "loss," specifically whether it encompasses loss of use or loss of access, must be considered in the overall context of the Policy language.  Here, Plaintiff's reading of the terms fails to connect "loss" to its modifying adjective "physical." *See Loss*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/loss (last visited October 7, 2021) ("[T]he partial or complete deterioration or **absence of a physical capability or function**.").

In fact, "giving separate effect to 'loss' and 'damage' in the phrase, 'direct physical loss of or damage to' only highlights the distinction between 'the permanent dispossession of' and 'damage.'" *See Biltrite Furniture, Inc. v. Ohio Sec. Ins. Co.*, No. 20-CV-656-JPS-JPS, 2021 WL 3056191, at *4 (E.D. Wis. July 20, 2021) (quoting *Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.*, 499 F. Supp. 3d 288, 294 (S.D. Miss. 2020)).  "It is not superfluous for 'loss' to mean exactly what it says.  The Court is not persuaded of the term's ambiguity or surplusage merely because one [other] court has come to another conclusion." *Id.*  The ordinary use of the terms "physical loss" and "physical damage" can "only be reasonably construed as extending to events that impact the physical premises completely (loss) or partially (damage)." *See Gaston & Murrell Family Dentistry, PLLC, v. Cincinnati Ins. Co.*, No. 3:20-CV-00776, 2021 WL 4311212, at *5 (M.D. Tenn. Sept. 22, 2021) (quoting *Dino Drop, Inc. v. Cincinnati Ins. Co.*, No. 20-12549, 2021 WL 2529817, *5 (E.D. Mich. Jun 21, 2021)).

As the Court previously acknowledged in *Cafe Plaza de Mesilla Inc. v. Continental Casualty Co.*, 519 F. Supp. 3d 1006, 1013 (D.N.M. 2021), "direct physical loss" may occur without "tangible" or "physical" destruction of a property.  *See, e.g.*, *Hughes v. Potomac Ins. Co. of D.C.*, 18 Cal. Rptr. 650, 655 (Ct. App. 1962) (*abrogated on other grounds by La Bato v. State Farm Fire & Cas. Co.*, 263 Cal. Rptr. 382 (Ct. App. 1989)) (finding "physical loss" where landslide left home "standing on the edge of and partially overhanging a newly-formed 30-foot cliff[,] deprived [homeowners] of subjacent and lateral support essential to the stability of their house," and rendered the home "completely useless"); *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 17 (W. Va. 1998) (finding "physical loss" where there was a real and actual threat that "rocks and boulders could come crashing down at any time" which rendered the insurers' homes unsafe for habitation).

And as Plaintiff correctly notes, a number of courts have also found "'physical loss' in scenarios where the presence of a disease-causing agent must be cleaned from the property but there was no tangible physical damage present."  **Doc. 25, at 12**.  Indeed, contamination of a structure in a way that seriously impairs or destroys its function may qualify as direct physical loss.  For example, some courts have concluded that bacteria or harmful, noxious vapors may cause direct physical loss without physical damage.  *See, e.g.*, *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (contamination by gasoline fumes); *Cooper v. Travelers Indem. Co.*, No. C-01-2400, 2002 WL 32775680 (N.D. Cal. Nov. 4, 2002) (e. coli bacteria in restaurant well water); *American All. Ins. Co. v. Keleket X-Ray Corp.*, 248 F.2d 920 (6th Cir. 1957) (contamination by highly radioactive radium salt); *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830 (D. Or. June 18, 2002) (mold contamination); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010) (toxic gases released from

installed drywall).  In these cases, the physical structure of the building remained intact, but the building was rendered unfit for occupancy due to health risks.

Yet, other courts have concluded that contamination which is short-lived or does not prevent the use of the structure does not qualify as direct physical loss.  *See, e.g.*, *Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868 (11th Cir. 2020) (concluding the presence of dust particles from nearby roadwork was insufficient to cause physical loss or damage because the dust merely needed to be cleaned); *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002) (concluding that the presence of asbestos, without the release of any asbestos fibers, was insufficient to cause physical loss or damage); *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402 (D. Conn. 2002) (explaining that recovery was precluded for the "mere presence" of asbestos or lead paint, but acknowledging recovery for contamination of the premises by friable asbestos and non-intact lead-based paint).

Therefore, from the cases cited by both parties where courts have found or denied coverage, the Court identifies two complementary principles.  First, courts have consistently ruled that contamination by a pervasive or intrusive chemical or biological agent, not otherwise excluded from coverage, may cause a direct physical loss if it renders the insured property unusable or uninhabitable.  "This principle applies even though the contamination may be gaseous, microscopic, or invisible [to the human eye].  Covered losses are not confined to the obvious physical changes to a building caused by fire or bad weather."  *See Kim-Chee LLC v. Philadelphia Indem. Ins. Co.*, No. 1:20-CV-1136, 2021 WL 1600831, at *6 (W.D.N.Y. Apr. 23, 2021).  Second, contamination that is temporary or that which may be remedied without preventing use of the building has generally not been found to qualify as direct physical loss to the insured premises.  *Id.*  "This does not mean that the contamination is not expensive to remove or serious in its health

risks.  Rather, courts have recognized that first-party coverage responds to physical damage to the insured properly and not to all forms of loss or expense experienced by the property owner."  *Id.* In other words, the cases cited by the parties "mark two ends of a spectrum," from

> the **easily remedied intrusion** of road dust and ending with the **persistent hazard** of gasoline seepage. At one end, it is obvious that no direct physical loss or damage has occurred. **The foreign substance is temporary and does not prevent use of the structure**. At the other, few would question that although the building is still standing, it has been **rendered unusable because of the risk** of fire or explosion.

*Id.* at *6 (emphasis added).  In sum, the review of relevant caselaw emphasizes that the ordinary use of the terms "physical loss" and "physical damage" can "only be reasonably construed as extending to **events that impact the physical premises completely (loss)** or **partially (damage)**." *See Gaston*, 2021 WL 4311212, at *5 (emphasis added) (quoting *Dino Drop, Inc.*, 2021 WL 2529817, at *5).

Thus, although the Court agrees with Plaintiff that "direct physical loss" need not always be the result of a "tangible" physical harm, as applied here, the Court finds it reasonable to conclude that allegations of the presence of coronavirus in the insured premises, alone, are insufficient to trigger coverage under the Policy.  Consistent with other courts, including courts in the Tenth Circuit, in evaluating similar insurance provisions and allegations of coronavirus disruptions, the Court finds that the phrase "direct physical loss" requires something more than what Plaintiff has set forth in its Complaint.  *See, e.g.*, *Totally Tickets v. Sentinel Ins. Co., Ltd.*, No. CIV-20-778-SLP, 2021 WL 3526515 (W.D. Okla. July 14, 2021); *Till Metro Ent. v. Covington Specialty Ins. Co.*, No. 20-CV-255-GKF-JFJ, 2021 WL 2649479 (N.D. Okla. June 28, 2021); *Sagome, Inc., v. Cincinnati Ins. Co.*, No. 21-CV-0097-WJM-GPG, 2021 WL 4291016 (D. Colo. Sept. 21, 2021); *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191 (D. Kan. 2020); *see also Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20-16858, 2021 WL 4486509 (9th Cir. Oct. 1, 2021); *Selane Prod., Inc. v. Cont'l Cas. Co.*, No. 21-55123, 2021 WL 4496471,

at *1 (9th Cir. Oct. 1, 2021); *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, No. 21-3068, 2021 WL 4304607, at *4 (6th Cir. Sept. 22, 2021).

Moreover, even if New Mexico where to adopt an expansive definition of the phrase "direct physical loss or damage," Plaintiff's claim here must still fail.  Under the broadest interpretation of the phrase, the Court finds that where Plaintiff alleges that the coronavirus disease caused "direct physical loss" to its premises under the terms of the Policy, Plaintiff must plead that the premises were infiltrated, saturated, or so overwhelmed by a chemical or biological agent (in this case, COVID-19 particles) as to render it uninhabitable and make use of the building dangerous.  *See Western Fire Ins.*, 437 P.2d at 55 ("[T]he so-called 'loss of use' of the church premises, standing alone, does not in and of itself constitute a 'direct physical loss.' [T]his particular 'loss of use' was simply the consequential result of the fact that because of the accumulation of gasoline around and under the church building the premises became so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous."); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697, at *1 (11th Cir. Aug. 31, 2021) (noting that under the "common meaning of direct physical loss or damage[,] there must be an actual change in insured property that either makes the property 'unsatisfactory for future use' or requires 'that repairs be made.'"); *Promotional Headwear Int'l*, 504 F. Supp. at 1203–04 ("[E]ven assuming that the virus physically attached to covered property, it did not constitute the direct, physical loss or damage required to trigger coverage because its presence can be eliminated. Much like the dust and debris at issue in *Mama Jo's*, routine cleaning and disinfecting can eliminate the virus on surfaces.").

In sum, allegations of "loss of use" or "loss of the essential function" of the insured premises as specifically pled by Plaintiff are insufficient to trigger coverage under the plain reading

of the Policy, even where "direct physical loss" would be expansively read by the New Mexico Supreme Court.  Although an insurance policy must be construed liberally in favor of the insured, the Court will not strain construction of terms.  *Battishill*, 127 P.3d at 1115.

### 2. Plaintiff Has Failed to Plead Direct Physical Loss Due to the Presence of COVID-19 on the Premises.

Here, Plaintiff alleges that the physical presence of COVID-19 in its premises constitutes direct physical loss or damage to the premises.  First, Plaintiff argues that the "presence of the virus infiltrated the air and attached to its surfaces, rendering AAESC's facilities unsafe…for its 'essential function' of providing checkups and nonemergency services."  *See* **Doc. 25, at 11**. Plaintiff alleges that it was forced to close its business as "ordered by state and local governments." *See* **Doc. 1-1, ¶ 74**.  Plaintiff further alleges that three of its employees tested positive for COVID-19, and it learned from six patients that they had visited Plaintiff's facilities and subsequently tested positive for the virus.  *Id.* **¶ 79**.  Plaintiff asserts that "[t]he Coronavirus harmed and continues to harm AAESC causing physical loss and loss of intended use and physical damage to the premises, including its air."  *Id.* **¶ 83**.

Even accepting these facts as true, Plaintiff's allegations are insufficient to survive the motion to dismiss.  Plaintiff does not plausibly allege that the presence of the coronavirus on its premises actually rendered its property uninhabitable.  Although Plaintiff alleges that the virus "affixes to surfaces creating dangerous physical conditions," *see id.* **¶ 109**, and the Court accepts as true that Plaintiff's air was damaged, Plaintiff's primary contention regarding this condition is not that the premises was too dangerous to use or work in, but rather that Plaintiff was unable to "fully use" the property for non-emergency procedures after the issuance of government orders. *Id.* **¶ 77** ("AAESC's insured premises remain limited to essential activities and minimum necessary operations, with reduced capacity."); **Doc. 25, at 10** ("Here, AAESC lost the ability to

fully use its real, physical property for its designated purpose – even if a small portion of emergency services was exempted."). Here, as alleged, Plaintiff reduced the number of in-office employees and was able to occupy the premises and continue working throughout the pandemic. **Doc. 1-1, ¶ 76–77**.

As aptly put by the court in *Santo's Italian Cafe LLC v. Acuity Insurance Co.* in another coronavirus insurance case:

> Whether one sticks with the terms themselves (a "direct physical loss of" property) or a thesaurus-rich paraphrase of them (an "immediate" "tangible" "deprivation" of property), the conclusion is the same. The policy does not cover this loss. The restaurant **has not been tangibly destroyed**, whether in part or in full. And the owner **has not been tangibly or concretely deprived of any of it**. It still owns the restaurant and everything inside the space. **And it can still put every square foot of the premises to use, even if not for in-person dining use**.

No. 21-3068, 2021 WL 4304607, at *2 (6th Cir. Sept. 22, 2021) (emphasis added). Therefore, similarly, Plaintiff's allegations are insufficient to support a "reasonable inference" that it is covered under the Policy because Plaintiff has failed to plead facts to show that it sustained a "direct physical loss" as a result of the presence of COVID-19 in its facility.

### 3. Plaintiff Has Failed to Plead Coverage under the Business Income and Extra Expense Endorsement.

Having determined that the requisite "direct physical loss" has not been sufficiently pled, the Court agrees with Defendant that Plaintiff cannot plead coverage under the "Business Income and Extra Expense" Endorsement. To recover business income, the Policy provision requires that "[t]he 'suspension' [of operations] must be **caused by direct physical loss** of or damage to property at the described premises." **Doc. 1-1, Ex. 1, at 67** (emphasis added). Here, no such allegation has been made. Plaintiff readily alleges that it was the government orders, not the presence of the coronavirus, that caused its property to close. *See* **Doc. 1-1, ¶ 75** ("These Government Orders resulted in losing physical use of, physical access to, and physical enjoyment

of Plaintiff's property by its owners, patients, employees, and others."). Moreover, the New Mexico health orders do not suggest that non-emergency procedures were banned on Plaintiff's premises *because of* the presence of COVID-19 at Plaintiff's business or other businesses. Rather, the orders indicate that the perceived risk of COVID-19 lay not within buildings, but with large gatherings of people. *See, e.g.*, **Doc. 1-1, Ex. 4, at 198** (prohibiting mass gatherings, reducing the occupancy of food establishments to no more than 50% capacity, and closing casinos and horse racing facilities). Thus, Plaintiff cannot plausibly allege coverage under this provision of the Policy.

Similarly, under the Policy, the policyholder may recover "extra expenses," defined as "reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been **no direct physical loss of or damage to property**." *See* **Doc. 1-1, Ex. 1, at 68** (emphasis added). Defendant argues that "[i]mplicit in this provision…is the requirement that there be some physical change in the property such that it requires restoration to its pre-loss condition." **Doc. 16, at 17**. Defendant emphasizes that "[w]ithout that tangible, physical change in the property, there can be no definable period of restoration." *Id.* **at 17–18**. Plaintiff retorts that Defendant's interpretation of the "period of restoration" materially "conflicts with the Policy's complete language." **Doc. 25, at 17**. Plaintiff argues that it is reasonable to read the Policy as stating that "in some cases, the 'period of restoration' may only end when the business income limits are exhausted…nor does [such a reading] subject the insurer to open-ended liability." *Id.* In this case, Plaintiff argues that the business income coverage "will no longer apply once the Coronavirus pandemic no longer restricts the full use of the property, or when the policy limits of $1,766,530." *Id.*

20

The Court declines to adopt Plaintiff's reasoning.  The extra expense provision does not change the Policy requirement that the loss at issue result from direct physical loss or damage to the insured property.  As explained above, Plaintiff has not plausibly alleged any "direct physical loss," even under the broadest reading of the term, sufficient to trigger additional coverage under the extra expenses provision.

### 4.   Plaintiff Has Failed to Plead Coverage under the Civil Authority and Dependent Property Provisions.

For similar reasons, the Court determines that the facts alleged in the Complaint do not support coverage under the Civil Authority and Dependent Property provisions.  In relevant part, the Policy's Civil Authority Endorsement provides for the recovery of losses "caused by action of civil authority that prohibits access to the described premises[.] [The] action must be **due to direct physical loss of or damage** to property at locations, **other than described premises**."  **Doc. 1-1, Ex. 1, at 93** (emphasis added).

Defendant argues that Plaintiff cannot show coverage under this provision because Plaintiff failed to allege facts showing "(1) direct physical loss of or damage to property at locations 'other' than Plaintiff's premises; (2) a civil authority order or action that was due to direct physical loss of or damage at property at locations other than Plaintiff's premises; or (3) action by a civil authority prohibiting access to the premises."  **Doc. 16, at 19**.  In response, Plaintiff argues that the government orders do identify "physical loss."   First, Plaintiff asserts that the orders "increasingly limited the intended use of AAESC's space, first on capacity, then on how the space could be used (e.g., prohibiting AAESC's business for non-essential procedures), because of the physical harm posed by the coronavirus to surfaces and the air."  *See* **Doc. 25, at 21**.  Second, Plaintiff argues that "rarely" do government orders "identify specific businesses where access is

prohibited. Nor is denial of full access to the property at all times required for civil authority coverage to be triggered." *Id.* **at 22**.  The Court disagrees.

Here, as stated above, the COVID-19 restrictions were not issued as a result of property loss or property damage, but rather to control the spread of the virus by limiting human interaction, particularly in large gatherings.  Additionally, Plaintiff has failed to plead that the orders were the result of a direct physical loss to other properties.  Plaintiff's vague and conclusory allegation that the "same conditions resulted in the closure and restriction of access to other businesses immediately surrounding Plaintiff's business, including many 'feeder' businesses, i.e., businesses and medical practices that depend on the AAESC," is insufficient to withstand a motion to dismiss. *See* **Doc. 1-1, ¶ 84**; *see also Cafe Plaza*, 519 F. Supp. 3d at 1015.  Plaintiff fails to plausibly allege any specific instances of direct physical loss of or damage to property at other locations other than its own.  Therefore, Plaintiff cannot state a claim for Civil Authority coverage under the Policy.

Turning to the Dependent Property claim, the Policy provides for additional coverage due to "suspension" of operations "caused by direct physical loss or damage **at the premises of a Dependent Property**."  **Doc. 1-1, Ex. 1, at 184** (emphasis added).  Similarly, here, Plaintiff's claim fails because Plaintiff fails to identify any dependent property at issue, nor does Plaintiff plead any facts to support any "direct physical loss" at said dependent property.  *Cf.* **Doc. 1-1, ¶ 84** (referencing "feeder businesses" and stating that "AAESC relies on its credentialed physicians with privileges to schedule patients directly to its facility," but not discussing any specific properties operated by others whom Plaintiff depends on to attract customers).  Therefore, Plaintiff cannot plausibly state a claim for Dependent Property coverage under the Policy.

Consequently, the Court concludes that Plaintiff has failed to meet its burden to show coverage is established under any provision of the Policy, and its breach of contract claim must be dismissed.[2]

## II.   The Court Declines to Dismiss Plaintiff's Breach of Duty of Good Faith and Fair Dealing (Count II).

Defendant also moves to dismiss Plaintiff's bad faith claim.  *See* **Doc. 16, at 22**.  Defendant argues, first, that Plaintiff "cannot state a bad-faith claim predicated on coverage because there is no applicable coverage under the Policy," and second, that Plaintiff has not pled a "factual basis for bad faith in the absence of coverage."  *See* **Doc. 16, at 23**.  The Court disagrees.

"Under New Mexico law, an insurer who fails to pay a first-party claim has acted in bad faith where its reasons for denying or delaying payment of the claim are frivolous or unfounded." *See Sloan v. State Farm Mut. Auto. Ins. Co.*, 85 P.3d 230, 236 (N.M. 2004).  The terms "frivolous or unfounded" in this context "does not mean erroneous or incorrect," rather, it means "an arbitrary or baseless refusal to pay, lacking any support in the wording of the insurance policy or the circumstances surrounding the claim."  *Id.* at 237 (quoting *Jackson Nat'l Life Ins. Co. v. Receconi*, 827 P.2d 118, 134 (N.M. 1992) (internal quotations omitted).  Therefore, an insurer may deny coverage "without exposure to a claim of bad faith failure to pay as long as it has reasonable grounds for the denial."  *Haygood v. United Servs. Auto. Ass'n*, 453 P.3d 1235, 1241 (N.M. 2019). Generally, reasonable grounds will follow from a "reasonable investigation," but where an insurer fails to make an "adequate investigation," it may be liable for a bad faith denial of a claim.  *Id.*

---

[2] Plaintiff also argues that Defendant's failure to include a "virus or pandemic exclusion" in the Policy is dispositive and shows intent to provide coverage.  *See* **Doc. 25, at 22–23**.  The Court declines to address this argument as Plaintiff must first sufficiently plead coverage before the burden shifts to the Defendant show coverage is precluded under an exclusion.  *See Cafe Plaza*, 519 F. Supp. 3d at 1016.

On one hand, claims of bad faith to pay "cannot arise unless there is a contractual duty to pay under the policy." *Id.* at 1242 (quoting *Charter Servs., Inc. v. Principal Mut. Life Ins. Co.*, 868 P.2d 1307, 1313 (N.M. 1994)). "[H]owever, a bad faith claim **need not depend on the existence of coverage**." *Id.* (emphasis added). Therefore, if bad faith is asserted as to conduct beyond a denial of coverage and the refusal to pay, the bad faith claim is actionable as to that conduct regardless of whether the contract claim survives. *Id.* ("Haygood might establish bad faith in a variety of ways—whether by proving Defendants failed to deal fairly in handling the claim, failed to conduct a fair investigation, or failed to fairly evaluate coverage, among other possibilities.").

Here, Plaintiff plausibly alleges that Defendant failed to fairly investigate the claim. Plaintiff alleges that Defendant "did not follow up with its insured, request an interview, or visit the covered location. [Defendant] also failed to review ample publicly available and easily accessible information regarding [the] claim." *See* **Doc. 1-1, ¶ 94**. Plaintiff further asserts that "before AAESC even submitted its documentation in response to [Defendant's] May 8 inquiries, on May 22, 2020, without reviewing any facts around the claim or seeking additional information, [Defendant] denied coverage." *Id.* **¶ 96**. Finally, Plaintiff alleges that after requesting a consideration of the claim, "[i]nstead of considering the additional information, however, [Defendant] forced AAESC to chase a series of claims handlers for a response. Each time AAESC thought its claim was being reconsidered, it learned that CNA had once again changed claims handlers who were reviewing the claim." *Id.* **¶ 97**. Taking these facts as true, the Court finds that these allegations are sufficient to withstand a motion to dismiss. Plaintiff has pled a claim for bad faith independent of the failure to pay. Plaintiff's claim for bad faith is not entirely foreclosed even in the absence of coverage under the Policy. *See Haygood*, 453 P.3d at 1243.

## III.   <u>Plaintiff Has Failed to Plausibly State a New Mexico Insurance Practices Act Claim</u>
   <u>(Count III).</u>

The New Mexico Unfair Insurance Practices Act ("NMUIPA") prohibits unfair or deceptive insurance acts.  *See* N.M. Stat. Ann. § 59A-16-20.  Here, Plaintiff alleges that Defendant violated five provisions of the NMUIPA by:

(A) Misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue;

(B) Failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies;

(C) Failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies;

(D) Failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured;

(N) failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

*See* **Doc. 1-1, ¶ 97**.

Plaintiff recites the statutory language of NMSA § 59A-16-20 but does not allege facts in the Complaint regarding any of the five alleged unfair practices.  For example, the Complaint makes no factual allegations that Defendants misrepresented the terms of the policy.  Nor does Plaintiff allege that these acts occurred "with such frequency as to indicate a general business practice."  N.M. Stat. Ann. § 59A-16-20.  Nor does Plaintiff state any factual detail on Defendant's alleged failure to respond to Plaintiff's inquiry.  Therefore, because Plaintiff does not provide any factual allegations in support of its claim, the mere "formulaic recitation of the elements of a cause of action" warrants dismissal of this claim.  *See Twombly*, 550 U.S. at 555.

## IV.   <u>Plaintiff Has Failed to Plausibly State a Claim under the New Mexico Unfair Practices</u>
   <u>Act (Count IV).</u>

Under the New Mexico Unfair Practices Act ("NMUPA"), "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." *See* NMSA § 57-12-3.  To state a claim under the NMUPA, a plaintiff must allege that "(1) defendant made an oral or written statement that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale of goods or services; (3) the conduct complained of occurred in the regular course of defendant's business; and (4) the representation may, tends to, or does deceive or mislead any person." *Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 621 (D.N.M. 2007); *Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1093 (N.M. Ct. App. 2007).

First, Plaintiff alleges that Defendant violated § 57-12-2(D)(14) by using ambiguity as to the coverage offered by Defendant.  *See* **Doc. 1-1, ¶ 163**.  Plaintiff also alleges that Defendant violated § 57-12-2(D)(17) by "offering first-party all-risk insurance coverage and charging a premium for coverage," but later denying coverage.  *See* **Doc. 1-1, ¶ 164**.  Finally, Plaintiff alleges that Defendant violated § 57-12-2(E) by withholding coverage "on a basis it failed to disclose to AAESC when it first sold the Policy" and knowingly offering first-party insurance with an intent not to supply the expected coverage.  *See* **Doc. 1-1, ¶¶ 165–166**.  Plaintiff supports it allegations by pleading that Defendant "knew, or…should have known, that under New Mexico law, its denial of coverage under the circumstances would amount to a failure to deliver the quality of goods and/or services promised at the time of sale."  *See* **Doc. 1-1, ¶¶ 167**.

In response, Defendant argues that Plaintiff's claim must be dismissed because Plaintiff fails to: (1) identify any oral or written statement that was false or misleading, (2) provide material facts to support its contention of ambiguity, (3) allege facts that Defendant knowingly misrepresented the quality of the Policy, and (4) allege facts in support of its contention that

Defendant took advantage of Plaintiff's lack of knowledge or experience in connection with the sale of the Policy. *See* **Doc. 16, at 26**. The Court agrees in part.

Here, the Court finds that Plaintiff has failed to state a claim for relief under the NMUPA. Plaintiff's Complaint does not identify which statement or statements at issue are false or misleading. *Cf.* **Doc. 25, at 24** ("[Defendant] is clearly on notice about who made what coverage misrepresentations and when."). Additionally, Plaintiff fails to allege facts in its Complaint to show that such a misrepresentation may or tends to deceive or mislead any person, nor does Plaintiff allege facts to show that such conduct occurred in the regular course of Defendant's business. A complaint must "contain either direct or inferential allegations respecting **all the material elements** necessary to sustain a recovery under some viable legal theory." *See Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (emphasis added) (quoting *In re Plywood Antitrust Litig.*, 655 F.2d 627, 641 (5th Cir. 1981)). At this stage, the Court must disregard "conclusory statements of law" and consider specific factual allegations. *See Kansas Penn Gaming*, 656 F.3d at 1214. Therefore, the mere "formulaic recitation of the elements of a cause of action" warrants dismissal of this claim. *Twombly,* 550 U.S. at 555.

## V.    Plaintiff Has Failed to Plausibly State a Claim for Declaratory Judgment (Count V).

Plaintiff also brings a claim under the New Mexico Declaratory Judgment Act, NMSA § 44-6-1 *et seq*. The Act grants courts the "power to declare rights, status and other legal relations whether or not further relief is or could be claimed." *See* NMSA § 44-6-2.

Because this case was removed to federal court on the basis of diversity jurisdiction, the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, "will control the procedure governing Plaintiff's claim for declaratory judgment." *See Miller v. Cincinnati Ins. Co.*, 323 F. Supp. 3d 1253, 1256 (D.N.M. 2018) (noting that the Federal Declaratory Judgment Act "does not create

substantive rights for parties…[but] merely provides another procedure whereby parties may obtain judicial relief").   Under the Act, "[i]n a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a).  The question in each case is whether the facts alleged show that "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *see also Golden v. Zwickler*, 394 U.S. 103, 109 (1969).

Plaintiff argues that its loss is covered under the Policy and "seeks a judicial determination and declaration that CNA is obligated to insure the direct physical loss to AAESC under the Policy." **Doc. 1-1, ¶ 176**.  Plaintiff states that this "controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment" and "judicial declaration is necessary and appropriate at this time" because the parties have failed to reach an agreement regarding Defendant's obligations under the Policy.  *Id.* **¶¶ 177–78**.  Defendant asserts that Plaintiff's declaratory relief claim is duplicative of the breach of contract and statutory claims and should be dismissed.  **Doc. 16, at 27**.

The Court finds that Plaintiff has not plausibly stated a claim for declaratory relief.  Here, Plaintiff asserts that declaratory relief is appropriate, however, Plaintiff fails to plausibly allege any facts to support a reasonable inference of "sufficient immediacy and reality" regarding the controversy at issue.  Therefore, Plaintiff has failed to plead the essential elements of a claim for declaratory relief and the Court dismisses this claim.

**CONCLUSION**

For the reasons stated above, the Court concludes that Plaintiff's Complaint fails to state a plausible claim for relief.  Plaintiff has also requested leave to amend.  *See* **Doc. 25, at 24**; **Doc. 25, at 21 fn. 69**.  At this stage in the case, amendment should be "freely given when justice so requires."  Fed. R. Civ. P. 15(a).  A court should grant leave to amend unless "it is 'patently obvious' that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile."  *Cohen v. Longshore*, 621 F.3d 1311, 1314–15 (10th Cir. 2010) (quoting *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991)); *Staats v. Cobb*, 455 F. App'x 816, 818 (10th Cir. 2011) ("[A] court should dismiss *with leave to amend*…if it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief.").  Here, the Court cannot conclude that amendment would be futile.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss (**Doc. 16**) is hereby **GRANTED IN PART AND DENIED IN PART** for reasons described in this Memorandum Opinion.  Counts I, III, IV, and V are **DISMISSED WITHOUT PREJUDICE**, however, Count II remains.  The Court grants Plaintiff leave to amend.  Plaintiff may file an amended complaint within **thirty (30) days** of the entry of this order.  Defendant will have **21 days** to respond to should Plaintiff file an amended complaint.

**IT IS SO ORDERED.**

**KEA W. RIGGS**
**UNITED STATES DISTRICT JUDGE**